**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**
**CASE NO.: 1:09-CV-00030-TBR**

**WOLF RIVER OIL COMPANY**                                               **PLAINTIFF**

v.

**EQUITY GROUP - KENTUCKY DIVISION, LLC**                                **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendant, Equity Group-Kentucky Division, LLC's ("Equity"), Motion for Partial Summary Judgment (Docket # 18). Plaintiff, Wolf River Oil Company ("Wolf River"), has filed a response (Docket # 19). Defendant has filed a reply (Docket # 22). This matter is now ripe for adjudication. For the reasons that follow, Defendant's motion is GRANTED.

**BACKGROUND**

This case arises out of a contract dispute between Wolf River and Equity. Equity, originally known as Cagle's-Keystone Foods, LLC, was established in 1998 and operates an integrated chicken processor located in Albany, Kentucky. Equity began operations at its Albany, Kentucky, plant on or about November 2, 1998. Equity's employees wear smocks and other garments which need to be laundered regularly.

Prior to the opening of Equity's Albany plant, Equity and Wolf River negotiated regarding terms pursuant to which Wolf River would supply Equity's laundering needs through an on-site laundry operation. Wolf River's sole owner and principal, Daniel Laib, conducted the negotiations with Ron Prouse, Equity's original Complex Manager.

Prouse drafted the Laundry Service Contract ("Contract") and sent it to Laib. On October 6, 1998, Laib signed the Contract. The Contract was also signed by Ron Prouse on behalf of Equity,

although it is not clear when Prouse actually signed.[1] At the time Laib signed the Contract, Wolf River did not own and had not yet purchased any of the laundry equipment necessary to perform laundry services for Equity, nor had it obtained the financing necessary to purchase that equipment.

On October 16, 1998, Equity entered into an agreement with Citizens Bank of Albany ("Bank") to guarantee Wolf River's loan. The guarantee agreement states Wolf River obtained a loan in the amount of $54,032.00, payable in sixty monthly installments, in order to purchase laundry equipment to perform the Contract. On October 29, 1998, Wolf River began performing the laundry service at the plant pursuant to the Contract.

The Contract states:

This contract shall be in effect for five years and automatically renewable for another five years, and then on a yearly basis unless written [notice] is given by either party 90 days prior to any renewal dates. If C.K.F. or W.R.O's (sic) terminates their business relationship, C.K.F. agrees to purchase the equipment at book value less straight line depreciation.

DN 18-10.[2] The only date on the Contract is the date of Laib's signature, October 6, 1998. The Contract does not provide the renewal date or define "renewal dates."

On March 11, 2002, Tim Lawson, then Equity's Complex Manager, sent a letter to Wolf Oil terminating the Contract and rejecting any renewal. Liab testified at his deposition that he responded to that letter on March 18, 2002. In Liab's response he stated the Contract was locked in for another six and a half years due to the automatic renewal. Equity states the termination letter

---

[1] Laib states in his deposition testimony that when he signed the Contract, Prouse had not yet signed the Contract. Laib states he transmitted the Contract to Equity for approval but does not recall how he did so. Prouse states in his affidavit that he signed the Contract on October 6, 1998.

[2] Both parties agree that the word "motive" in the Contract is an error intended to be "notice."

was never rescinded and was expressly stated to be effective "at the conclusion of [the Contract's] term." Wolf River continued to perform laundry services at the plant until October 4, 2008.

On July 8, 2008, Robert Williams, now Equity's Complex Manager, by letter stated Equity intended to terminate the Contract at the conclusion of its term. The letter was placed in the United States Postal Service (USPS) on July 8, 2008. It was delivered by certified mail to Wolf River on July 22, 2008. Another copy was hand delivered to Laib on July 16, 2008.

Wolf River filed this action March 3, 2009. Wolf River first asserted that Equity breached the Contract by failing to give proper and timely notice thus the Contract automatically renewed for one year. Wolf River also asserted in its Amended Complaint that Equity breached the Contract by failing to pay the fair market value of the equipment.

Equity now moves the Court for partial summary judgment as to the issue of timely notice regarding termination of the Contract.

**STANDARD**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v.*

3

*Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

"The construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000) (citing *Hibbitts v. Cumberland Valley National Bank & Trust Company*, 977 S.W.2d 252, 254 (Ky. Ct. App.) (1998)). The primary objective of contract interpretation by the Court is to effectuate the intentions of the parties. *3D Enterprises Contracting Corp. v. Louisville and Jefferson County Metropolitan Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005) (citing *Cantrell Supply, Inc. v. Liberty Mutual Insurance Co.*, 94 S.W.3d 381, 384 (Ky.App.2002)). "When no ambiguity exists in the contract, we look only as far as the four corners of the document

to determine the parties' intentions." *Id.* (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky.2000)); *see also Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699 (Ky. 2006). Only "[w]here a contract is ambiguous or silent on a vital matter, [may a court] consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties" *Cantrell*, 94 S.W.3d at 385. An ambiguous document is "one capable of more than one different, reasonable interpretation." *Central Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981); *see also Cantrell*, 94 S.W.3d at 385.

The Contract is ambiguous with regard to determination of the renewal date. The Contract merely states "written [notice] is given by either party 90 days prior to any renewal dates." Nowhere does the Contract define "renewal date" and there are no dates provided in the Contract other than the date of Laib's signature. As the Contract is ambiguous, the Court may look to extrinsic evidence to determine the intent of the parties with regard to determination of the renewal date.

Equity asserts that the renewal date should be determined based on when the Contract became "in effect." Therefore, Equity states the renewal date should be construed as October 29, 2008, the date Wolf River began performing services giving "effect" to the Contract or October 16, 2008, the date Equity agreed to guarantee Wolf River's loan if the Contract became "in effect" at that time. Equity reasons that the July 8, 2008, letter provided notice 90 days prior to both the October 29th and October 16th possible renewal dates. In the alternative, Equity maintains the March 11, 2002, letter provided sufficient notice of termination of the Contract.

Wolf River asserts the Contract began on October 6, 1998, and therefore the renewal date is October 6, 2008. Wolf River points to the affidavits of both Laib and Prouse which state the

parties intended the contract to be effective on the date it was signed. Wolf River asserts the July 8, 2008, notice was untimely as notice was required to given by July 4, 2008, in order to be timely. Wolf River also argues the March 11, 2002, letter did not provide notice.

The earliest date which has been asserted as a possible renewal date is October 6, 2008. The Contract required that notice be "given . . . 90 days prior to any renewal dates." July 8 is exactly 90 days prior to October 6, not including October 6. Therefore, taking the facts in the light most favorable to Wolf River, the July 8, 2008, letter was still timely given even if based upon the earliest possible renewal date. The Court need not address the timeliness of the March 11, 2002, letter as it has found the July 8, 2008, notice was timely. Additionally, while the Contract is ambiguous regarding the renewal date, the language is clear that notice need not be received by the parties, only "given." Equity has established, and Wolf River does not dispute, that notice of termination of the Contract was given to Wolf River on July 8, 2008.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED Defendant's motion for partial summary judgment is GRANTED.